The State v. Charles L. Howell, Appellant.—300 S. W. 807.

Division Two, December 12, 1927.

*Freeman L. Martin* for appellant.

774

*North T. Gentry*, Attorney-General, and *J. D. Purteet*, Special Assistant Attorney-General, for respondent.

HIGBEE, C.—On January 29, 1926, an indictment was returned in the Circuit Court of the City of St. Louis charging that the defendant and John Allen and Raymond Hurling, *alias* Raymond Allen, with intent to cheat and defraud, did, on January 26, 1925, attempt to obtain from the Liberty Life Insurance Company of Chicago, Illinois, a corporation, the sum of $3,000 by means and by use of a trick, false and fraudulent representations, statements and pretenses. The defendant Howell was granted a severance, and on a trial to a jury was found guilty as charged in the indictment, his punishment assessed at imprisonmment in the penitentiary for five years, and he appealed.

The defendants are negroes. Howell conducted an undertaking establishment in the city of St. Louis. John Allen was a barber, and Raymond Hurling, age twenty-nine, was employed by him as a barber in his shop. The Liberty Life Insurance Company is an Illinois corporation with its principal office in Chicago. It has a branch office in St. Louis. E. W. Brown was employed by the insurance company to solicit and write life insurance in St. Louis. In

January, 1925, Brown called on Howell to get a list of prospects, insurance risks, and among others got the name of the defendant John Allen. He called on Allen at his barber shop about January 20, 1925, and solicited him to take a policy of insurance on his life. Allen said he had not anticipated taking any insurance on himself, but he had a boy, meaning Raymond Hurling, that he would like to insure, but he didn't have the money. He told Brown to see Charley Howell, the defendant. Brown reported the matter to Howell, who said he would look after the payment of the premiums. Brown returned to Allen, who had Raymond Hurling, under the assumed name of Raymond Allen, make an application to the Liberty Life Insurance Company for a policy of $3,000 on his life, in favor of John Allen as beneficiary, stating in the application that John Allen was the uncle of the insured. Raymond Hurling was identified at the trial as the applicant for insurance. He was not related to John Allen. Howell and John Allen paid the first quarterly premium. Hurling, *alias* Raymond Allen, paid no part of the premium. The application was delivered to Brown, who turned it in to the branch office of the insurance company in St. Louis. The policy of insurance was issued on February 11, 1925, insuring the life of Raymond Allen for $3,000, payable to John Allen, uncle of Raymond Allen, beneficiary, on proof of the death of Raymond Allen.

In the latter part of November the insured feigned illness. Howell called a physician, saying that Raymond was suffering from pneumonia. The physician made several calls but found him in normal health. His last call was on the afternoon of December 1, 1925, at which time he was told by a woman at the house that insured had died that morning at about 10:30, and that the body had been removed to Howell's undertaking establishment. He went at once to Howell, who told the physician that the body was there and that he had embalmed it. The physician protested that he should have been consulted and that an autopsy should have been performed to find out the cause of the death. Howell said the insured had died a natural death and an autopsy was unnecessary. On the same day the physician saw John Allen and told him he was suspicious of poisoning and that an autopsy should be performed. Allen became indignant at the suggestion of an autopsy. On the night of December 3, 1925, Howell put a corpse in a coffin, had it hauled to a cemetery, where the body was removed and half a sack of cement, some rags and excelsior put in the coffin, and it was buried. On December 8, 1925, Howell had complete proofs of the death and burial made out (he himself swearing to the undertaker's certificate) and delivered to the office of the insurance company in St. Louis. John Allen visited the office several times and demanded payment of the policy. But—"The best laid schemes o' mice an' men, gang aft a-gley."

A few days later, while success seemed assured, the coroner dug up the coffin, the scheme blew up and the defendant landed in jail. At the trial the State entered a *nolle prosequi* as to the defendant Raymond Hurling and he testified as a witness for the prosecution. The application, the policy and proofs of death were read in evidence.

II. Appellant's learned counsel in his brief insists that the court erred in overruling the demurrer to the indictment because it failed  to "allege that the defendants did fail in the perpetration of the alleged offense and were prevented and interrupted in executing the alleged offense, and fails to allege how the money was attempted to be obtained."

The indictment is based on Section 3552, Revised Statutes 1919, which reads in part:

"Every person who, with the intent to cheat and defraud, shall obtain or attempt to obtain from any other person, or persons, any money, property or valuable thing whatever by means or by use of any trick or deception, or false and fraudulent representation, or statement or pretense, or by any other means or instrument or device, commonly called 'the confidence game' . . . shall be deemed guilty of a felony," etc.

Omitting technical phrases and summarizing the indictment, it charges that the defendants, on January 26, 1925, at the city of St. Louis, entered into a conspiracy to cheat and defraud the Liberty Life Insurance Company of Chicago, Illinois, a corporation, by means and by use of a trick, false and fraudulent representations, statements and pretenses, and did in pursuance of said unlawful conspiracy falsely, fraudulently, designedly and feloniously represent, pretend and state to the officers and agents of the said insurance company that said Raymond Hurling, *alias* Raymond Allen, was the nephew of said John Allen and that said John Allen had an insurable interest in the said Raymond Hurling, *alias* Raymond Allen, and then and there made a written application to the officers and agents of said insurance company to issue a policy of insurance in the sum of $3,000 on the life of said Raymond Hurling, *alias* Raymond Allen, in favor of said John Allen; that the officers and agents of said insurance company believed the said false and fraudulent representations so made to be true and relied thereon and were then and thereby deceived and induced to and did on February 11, 1925, issue and deliver to the said Raymond Hurling, *alias* Raymond Allen, a policy of insurance on the life of him the said Raymond Hurling, *alias* Raymond Allen, in the sum of $3,000, payable to the said John Allen as beneficiary therein on proof of the death of said insured, and that in pursuance of said conspiracy to cheat and defraud said insurance company, the defendant, on December 8, 1925, fraudulently, etc., represented and

pretended to the officers and agents of said insurance company that the insured, Raymond Hurling, *alias* Raymond Allen, had died on December 1, 1925, and did fraudulently, etc., present to and file with the officers and agents of said insurance company certain false and fraudulent written affidavits of proof of the death of said Raymond Hurling, *alias,* etc., and then and there did unlawfully, etc., pretend that said insured died on December 1, 1925, at the said city of St. Louis, and that by means and use of the trick, false representations and the pretenses aforesaid, did then and there unlawfully, falsely, designedly and fraudulently attempt to obtain of and from said insurance company the sum of $3,000, lawful money of the United States, the property of said insurance company.

The indictment properly negatives the several false pretenses.

In 3 Bishop's New Criminal Procedure, 1353, sec. 194, the learned author says:

"For the Indictment,—a ready but not the exclusive method is to draw it in the same form as for the accomplished fraud, except that where the latter has 'did then and there unlawfully obtain,' etc., say, 'did then and there attempt unlawfully to obtain,' etc., or 'unlawfully attempt or endeavor unlawfully to obtain,' etc."

Section 3683, Revised Statutes 1919, reads in part:

"Every person who shall attempt to commit an offense prohibited by law, and in such attempt shall do any act toward the commission of such offense, but shall fail in the perpetration thereof, or shall be prevented or intercepted in executing the same, upon conviction thereof, shall, in cases where no provision is made by law for the punishment of such attempt, be punished as follows," etc.

Section 3684: "No person shall be convicted of an assault with an intent to commit a crime, or of any other attempt to commit any offense, when it shall appear that the crime intended or the offense attempted was perpetrated by such person at the time of such assault or in pursuance of such attempt."

In State v. Fraker, 148 Mo. 162, 49 S. W. 1017, Judge SHERWOOD said:

"Hicks was indicted for attempting to poison one Anderson. Hicks, as charged in the indictment, purchased the poison and delivered it to another, soliciting her, for a promised reward, to administer the same; but it was not charged that the solicitee agreed to administer the poison or did any act toward the commission of the crime. In commenting on the insufficiency of the indictment, LEWIS, P., said: 'An attempt to commit a crime is compounded of two elements: 1. The intent to commit it; and 2. A direct, ineffectual act done towards its commission.' [Code, sec. 3888; 2 Bishop's Crim. Proc., sec. 71.] Or as Wharton defines it, 'an attempt is an intended, apparent, unfinished crime.' Therefore, the act must reach far enough toward the accomplishment of the desired result to amount to the commencement

of the consummation. It must not be merely preparatory. In other words, while it need not be the last proximate act to the consummation of the offense attempted to be perpetrated it must approach sufficiently near to it to stand either as the first or some subsequent step in a direct movement towards the commission of the offense after the preparations are made. [Uhl v. Commonwealth, 6 Gratt. 706; McDade v. People, 29 Mich. 50; Hicks v. Com., 86 Va. 223.]''

Again, on page 164:

''In re Schurman is a case which in many of its features bears a strong resemblance to the one here presented; there the sufficiency of the information under which defendants were held was questioned by *habeas corpus.* One of the syllabi of that case prepared by the court announces the substance of the information and the ruling thereon, thus: 'A charge that certain persons caused one of their number to have his life insured for the benefit of his wife, and then falsely pretended that the insured was injured; that he died, and was buried; that his body was stolen from the grave; that all was done for the purpose of obtaining the insurance money from the insurer; and that they were frustrated in the attempt before the offense was consummated; without alleging to whom the false representations and pretenses were made; and without stating that the beneficiary in the policy was connected or cooperated with them in the attempt, or had any knowledge of their acts or purposes; and which does not state that the defendants intended to lead the beneficiary to believe that the insured was dead, or to procure her to present a claim for the insurance money, or to obtain from her the policy or a transfer of the same; and which did not aver the means by which the money was intended to be obtained—does not constitute a punishable attempt to obtain money by false pretenses.' [20 Pac. 277.]

''In concluding his remarks in that case, JOHNSON, J., observed: 'When the facts are so alleged, the means must at least be apparently sufficient to have accomplished the fraud, if the attempt had not been frustrated. Here Mrs. Reddington, the beneficiary, stood between the attempt and the execution. All of the steps taken, and specifically alleged to have been intended, would not have operated to defraud the company. If Reddington was injured, had died, and had been buried, as was pretended, then, so far as the information shows, there was still no apparent ability on the part of the defendants to commit the fraud. Mrs. Reddington, as has been stated, is not charged with cooperating in any way with the intended fraud. There is no statement that it was their intention to use her or the policy which she held to effect their purpose. Being the beneficiary, with the control of the policy, she effectually blocked the defendants from perpetrating a fraud on the company. If what was charged would naturally have resulted in inducing the company to part with its money, such attempt

would probably be an offense; "but when between the attempt and the execution is interposed the volition of an independent moral agent, then, by stress of the definition just given, an indictable attempt is not made out." [Wharton, Crim. Law, secs. 177, 178.]'

"3. There are yet other grounds for holding this count insufficient: Because, where false pretenses are alleged to have been made by a third person through the procurement of the defendant, such allegation cannot be supported except by the evidence that the defendant instigated such person to make them. [People v. Parish, 4 Denio, 153; 2 Wharton, Cr. Law (9 Ed.), sec. 1172; 2 Bishop, New Cr. Proc., sec. 193.]"

The indictment in the instant case pleads the conspiracy to cheat and defraud the insurance company by means and by use of a trick and certain false and fraudulent representations, the fraudulent procurement of a policy of insurance on the life of Raymond Hurling, the pretended nephew of the beneficiary, the pretended death and burial of the insured, and the false and fraudulent proofs of his death made and delivered to the agents of the insurance company with a demand for payment of the policy. These false pretenses and representations by three conspirators are well pleaded according to their substance. [State v. Martin, 226 Mo. 538, 548, 126 S. W. 442; 3 Bishop's New Crim. Proc. 1344, sec. 178.] They miscarried, however, in consequence of the exposure by the coroner. We do not think the indictment bad because it failed to plead the miscarriage. See reference to 3 Bishop's New Crim Proc. 1353, supra. The indictment fully informed the defendant of the "nature and cause of the accusation." It informed him that he was charged with an *attempt* to obtain money by false and fraudulent pretenses, clearly and definitely pleaded. The term *attempt* as here used, in its usual acceptation, implies that the scheme to cheat and defraud aborted. If one should say that A attempted to commit suicide, we would clearly understand that he did not succeed in the attempt to take his life. The statute reads: "Every person who with intent to cheat and defraud shall obtain or attempt to obtain;" not who shall attempt to obtain and *fail*. In this respect the indictment is in the language of the statute. There are precedents, framed by good pleaders, which, as I think, out of abundant caution, include the averment of failure. It is true that failure of the attempt is an element of the offense, but in my opinion, it need not be pleaded.

As said by Judge Burgess in State v. Woodward, 156 Mo. 143, 147, 56 S. W. 880: "The rule is that the allegations with respect to the facts constituting the offense should be sufficiently specific to inform the defendant and the court of the nature of the crime charged, and to enable the defendant to plead in bar any judgment which may be rendered, to any subsequent prosecution for the same offense, and there can be no question but that defendant

might plead in bar whatever judgment may be rendered in this case, whether of acquittal or conviction, to any subsequent prosecution for the same offense. By a fair and reasonable construction of the language of the indictment, defendant is notified that he is charged with attempting to obtain from the Farmers' Bank of Commerce, forty dollars by means of false representations, and pretenses, and to hold otherwise, would be not only to violate the ordinary rules of the construction of language, but to 'adhere to technicalities when they do not involve or contain principle' and under such circumstances are 'empty and without reason, and tend to defeat law and right.' "

If, however, failure of the attempt, being an element of the offense, should be pleaded, it cannot be said that the fact that it is not pleaded, could have prejudiced the accused. And according to the Statute of Jeofails, "no indictment or information shall be deemed invalid . . .; nor for any other defect or imperfection which does not tend to the prejudice of the substantial rights of the defendant upon the merits." [Sec. 3908, R. S. 1919.]

II. The other branch of this contention is that the indictment fails to allege how the money was attempted to be obtained.

We have seen that the defendant and his co-conspirators, the insured and the beneficiary, in pursuance of their scheme to defraud the insurance company, had induced it to execute the policy by which it obligated itself to pay the beneficiary the sum of $3,000 on proof of the death of the insured. The insured enacted his part of the scheme; he "played dead." Howell and John Allen, the beneficiary, who had paid the premiums for one year from the date of the issuance of the policy, within the year made and delivered to the agent of the insurance company due and formal proofs of the death of the insured and demanded payment of the sum apparently due to the beneficiary. If these facts do not constitute an attempt to cheat and defraud the insurance company, it may be doubted if a case could be conceived of that would come within the terms of the statute. The facts do not show merely a conspiracy, nor mere preparation to obtain the money apparently due from the insurance company. The conspirators formally did the last proximate act that apparently entitled the beneficiary to payment of the sum provided by the policy and the beneficiary demanded payment. The case is the converse of that referred to in State v. Fraker, supra. In that case the beneficiary "effectually blocked the defendants from perpetrating a fraud on the company. "

See also Kelley's Crim. Law, sec. 1092, where, *inter alia*, it is said: "The doctrine seems to be, that whenever the law makes one step toward the accomplishment of an unlawful object, with the intent or

purpose of accomplishing it, criminal, a person taking that step with that intent or purpose, and himself capable of doing every act on his part to accomplish that object, cannot protect himself from liability, by showing that by reason of some fact unknown to him at the time of the attempt it could not be carried into effect in the particular instance."

In 25 Corpus Juris, Section 46, page 615, it is said: "If accused with the requisite intent has done some act toward obtaining the property, it is none the less an attempt because for some reason unknown to him he could not have completed the crime, or because the falsity of his representations is discovered before he has an opportunity to proceed further in his endeavor to obtain the property; . . . but the act done toward the accomplishment of the end in view must be adapted to secure that end." [See also 8 R. C. L., p. 279, and State v. Mitchell, 170 Mo. 633 (2), 71 S. W. 175.]

These pronouncements seem to be in harmony with our statute, Section 3683, set out, supra.

In this case the insured, the beneficiary and the defendant Howell worked harmoniously together to the last proximate act, to accomplish the crime. Neither of them balked, as did Mrs. Reddington, the beneficiary in the case cited in State v. Fraker. The means employed were apparently adapted to and sufficient to accomplish the fraud if it had not been exposed by the coroner. The indictment is sufficient and the evidence supports the averments as to how the insurance money was to have been obtained. The demurrers to the indictment and to the evidence were properly overruled.

III. It is insisted the court erred in admitting the coffin in evidence as it tended to prejudice the jury. The defendant made an affidavit as part of the proofs of the death of the insured that he was an undertaker and as such attended the funeral of Raymond Allen and that the body was interred in Father Dickson Cemetery on the 3rd day of December, 1925. The coffin in which it was pretended the body of Raymond Hurling, *alias* Raymond Allen, was buried was taken up and offered in evidence in connection with the showing that it contained cement, rags and excelsior. The coffin was properly admitted in evidence as part of the *res gestae*.

IV. Complaint is made in the motion for new trial that the court erred in giving oral instructions and in admitting illegal and incompetent evidence. These objections are too general to meet the requirements of the statute as to motions for new trial. [State v. Standifer, 289 S. W. 856.]

V. It is also contended that the first instruction is broader than the indictment. Learned counsel has not indicated wherein it is subject to this criticism. The instruction covers more than four printed pages. We have studied it carefully and find no basis for this complaint.

VI. Again, it is contended in the motion for new trial that the court had no jurisdiction to try the cause because it is a misdemeanor; that the court erred in instructing the jury in instruction numbered 1 as to the punishment in the case and in refusing to give an instruction as to the offense as charged being a misdemeanor.

We might conjecture that learned counsel is of the opinion that the case falls under Section 3490, Revised Statutes 1919, relative to conspiracy, which is a misdemeanor, but here again the motion fails to "set forth in detail and with particularity in separate numbered paragraphs the specific grounds or causes therefor." [Laws 1925, sec. 4079, p. 198.] Section 3491 declares that "no agreement, except to commit a felony upon the person of another, or to commit arson or burglary, shall be deemed a conspiracy unless some act besides such agreement be done to effect the object thereof, by one or more of the parties to such agreement." It might be difficult to trace the distinction between a conspiracy, which must be evidenced by some act done to effect the object of the agreement, and an attempt to cheat and defraud by false and fraudulent representations. However, the evidence here clearly shows that the overt acts of the conspirators exceeded the bounds of mere preparation and brought the case within the provisions and penalties of Section 3552 relative to attempts to cheat and defraud by false and fraudulent pretenses and representations.

The defendant took the witness stand and testified that he was forty-two years of age and that he had never been convicted of a crime. His testimony went no further. He had a fair trial. Finding no error in the record the judgment is affirmed. *Davis* and *Henwood, CC.,* concur.

PER CURIAM:—The foregoing opinion by HIGBEE, C., is adopted as the opinion of the court. All of the judges concur.